2023 PA Super 241

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LARRY RAY YAW JR. | : | |
| | : | |
| Appellant | : | No. 2643 EDA 2022 |

Appeal from the PCRA Order Entered September 20, 2022
In the Court of Common Pleas of Lehigh County Criminal Division at
No(s): CP-39-CR-0001980-2016

BEFORE: OLSON, J., STABILE, J., and McLAUGHLIN, J.

OPINION BY OLSON, J.: **FILED NOVEMBER 21, 2023**

Appellant, Larry Ray Yaw, Jr., appeals from the September 20, 2022 order entered in the Court of Common Pleas of Lehigh County that denied his petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546. We affirm.

The PCRA court summarized the factual history as follows:

On April 3, 2016, at approximately 8:00 [a.m.], Officer Raymond Seiling of the Whitehall Township Police Department [("Officer Seiling")] was dispatched to [a residence located in] Whitehall, Lehigh County, Pennsylvania[. Officer Seiling was] in full uniform and [driving] a marked police [cruiser when he responded to] a call of a break[-]in at [the] residence in which the [victim] was assaulted. When he arrived, Officer Seiling observed the victim[] lying on the bed in a bedroom, bleeding from his face[ and] the back of his head, [as well as] moaning and writhing in pain. [The victim] was unable to speak with the police and was immediately transported to [a hospital] for treatment of his injuries. In addition, Officer Seiling immediately noticed signs of forced entry into the [residence]. Subsequently, at approximately 8:30 [a.m.], Detective Jeffrey Bruchak of the Whitehall Township Police Department [("Detective Bruchak")] arrived on scene. Detective Bruchak also observed signs of forced entry. In

addition, a small [0].22 caliber casing was located outside [the victim's] bedroom door.

Detective Bruchak spoke with [the victim's] roommate[. The roommate] indicated that [the victim] was in the apartment on the evening of April 2, 2016, with [a female acquaintance]. They spent most of the time in [the] bedroom, but [the victim] came out of the bedroom to ask for a towel so that [the female acquaintance] could shower. At approximately 11:45 [p.m. the victim] advised his roommate that he was taking [the female acquaintance] home to her residence in Gilbertsville[, Montgomery County, Pennsylvania. The roommate] and his girlfriend[] asked [the victim] if he could cash a lottery ticket for them, as well as grab a few grocery items for them at the store while he was out. [The victim and the female acquaintance] were in good spirits and were joking around at the time. [The victim] returned to the apartment in Whitehall between 1:30 [a.m.] and 2:00 [a.m.] on April 3, 2016. He had cashed the lottery tickets, as well as purchased a few groceries with the money from the lottery ticket winnings. [The victim] gave his roommate[] the change and then retired to his bedroom. [The roommate and his girlfriend] made a pizza and then watched television until approximately 3:00 [a.m.]

[The roommate and his girlfriend] were sleeping [in the roommate's bedroom] in the [residence] when, at approximately 8:00 [a.m.], they were awakened by a loud noise. [The roommate] got out of bed just as [his] bedroom door was kicked in by a male who [the roommate] knows as "Larry." "Larry," later identified as [Appellant,] entered the bedroom holding a small black handgun in his right hand and a dark metal baseball bat in his left hand. [Appellant] stated, "Oh, wrong room," and left. [The roommate] then heard a loud noise, a gunshot[,] and a lot of commotion. Immediately thereafter, [the roommate] heard [Appellant] and [the victim] screaming. [The roommate] peeked out of his bedroom and observed [the female acquaintance] standing in the kitchen next to the refrigerator, and [Appellant] walk[ing] out of [the victim's bed]room. As [Appellant] was leaving, he pointed the gun at [the roommate] and stated something to the effect of, "If you tell anyone I was here, I will come back for you." [The roommate] looked into [the victim's bed]room and observed [the victim] unable to stand up, disoriented, and bleeding from the back of his head. [The roommate] instructed [his girlfriend] to call the police. After this incident, [the roommate and his girlfriend] went to the

- 2 -

headquarters of the Whitehall Township Police Department to give statements.

Detective Bruchak also spoke with [the roommate's girlfriend]. [The roommate's girlfriend] indicated that she too had seen [the female acquaintance] in the [residence] on April 2, 2016[,] with [the victim], and that she was aware of [the victim] taking [the female acquaintance] back to her residence. [The roommate's girlfriend] also stated that she saw [Appellant] enter [the roommate's] bedroom holding a baseball bat and a handgun. Overall, her version of events was consistent with that of [the roommate]. While at police headquarters, [the roommate and his girlfriend] were presented with two [] photo[graphic] arrays. Both [the roommate and his girlfriend] positively identified [Appellant] as the person who entered [the roommate's] bedroom on April 3, 2016, while they were sleeping.

In addition, at trial, [the female acquaintance] confirmed that she spent the evening of April 2, 2016, with [the victim] in Whitehall doing methamphetamine and heroin, and watching the television. As background, she explained that on March 31, 2016[,] and April 1, 2016, she and [the victim] exchanged [] messages [*via* a social media application] with each other regarding getting together. Ultimately, [the victim] picked [the female acquaintance] up from her residence [in] Gilbertsville[ on April 1, 2016,] at approximately 9:00 [p.m.] They hung out together until about 3:00 [a.m.], at which time, [the victim] drove [the female acquaintance] back to her residence in Gilbertsville that she shared with [Appellant] and two [] other roommates. She arrived home at approximately 4:30 [a.m.] The next day, April 2, 2016, [the female acquaintance] and [the victim] exchanged more [social media] messages in order to facilitate their getting together. Again, [the victim] picked up [the female acquaintance] and drove her to his residence in Whitehall. There, they used methamphetamine and heroin, which caused [the female acquaintance] to feel sick and throw up. [The victim] drove her back to her residence at approximately 12:30 [a.m.] Upon her arrival home, [the female acquaintance] messaged [the victim] on [the social media application] requesting him to message her when he returned home. In compliance with her request, [the victim] messaged [the female acquaintance] around 1:54 [a.m.]

When [the female acquaintance] arrived home, [Appellant] was not present. In fact, [Appellant] had yet to return home by 4:00 [a.m.], despite exchanging [textual messages] with [the

female acquaintance] earlier in the morning. However, around 6:30 [a.m., Appellant] arrived [at the residence intoxicated] and went through [the female acquaintance's cellular telephone messages] during a verbal fight that had started. [Appellant] discovered that [the female acquaintance] had been communicating with [the victim], and getting high together. He became angry and began to punch [the female acquaintance] with a closed fist in the jaw and cheek area of her face. [The female acquaintance] told [Appellant] that she thought that she was pregnant, and [Appellant] proceeded to hit [the female acquaintance] in her stomach and threw her across the bed. [Appellant] then dragged her outside of the residence where he continued to beat her. Specifically, [Appellant] punched [the female acquaintance] along her body. [Appellant] then took her to the garage and continued to hit her in the face with a closed fist. [Appellant] subsequently left the garage area and locked the garage door. When he returned about one [] to two [] minutes later, [Appellant] had a firearm in his hand.

[Appellant] began to question [the female acquaintance] about her relationship with [the victim]. When [the female acquaintance] admitted that she had slept with [the victim] the previous night, [Appellant] forced [the female acquaintance] to lie on a tarp[,] and he continued to beat her. He hit her in her head with the handgun. [Appellant] left the garage again and returned this time with a metal baseball bat. Then, [Appellant] induced [the female acquaintance] to tell him where [the victim] lived. [Appellant] forced [the female acquaintance] to get into his truck. While driving, [Appellant] continued to strike [the female acquaintance] in the face. [Appellant] threatened that if [the female acquaintance] tried to run or scream when they arrived at [the victim's residence], he would kill her and her father. [The female acquaintance] indicated that [Appellant] arrived at [the victim's residence] and entered with the handgun in his right hand and the baseball bat in his left hand. [The female acquaintance] heard [Appellant] break [open] the door to [the roommate's] bedroom within the [residence]. She also heard [Appellant] discharge the firearm outside the door of [the victim's] bedroom. [The female acquaintance] indicated that during the assault, she could hear the sound of the baseball bat hitting [the victim's] skull. She further stated that after the assault, she and [Appellant] left the area in his [] truck. During the trial, [the female acquaintance] testified for the first time that [Appellant] stopped somewhere in the woods and had non-consensual sex with her.

Afterwards, [Appellant] made another stop at his friend['s] house, where he asked this friend to hide the baseball bat. [The friend] placed the baseball bat in his van that was situated on his driveway. Subsequently, [Appellant and the female acquaintance] drove around for a while until ultimately [Appellant] drove himself and [the female acquaintance] back to the residence in Gilbertsville.

Upon her return home, [the female acquaintance] talked with her roommate[] for a while and then fell asleep. She was awoken by [Appellant] when he placed a hand over her mouth advising her that the New Hanover Police were there and that she should not say anything. Ultimately, [the female acquaintance] and [Appellant] emerged from their bedroom. When the [police] officers saw her bruises, cuts on her face, lumps on her head and body, scrapes on her knees, as well as other injuries, [the female acquaintance] told them that she had "fallen."

[Appellant] was taken into custody and placed in a marked police unit. Subsequently, he was transported to the New Hanover Police Department. In addition, the police took [the female acquaintance] into custody as a result of an outstanding warrant out of Berks County[, Pennsylvania,] for burglary charges. [The female acquaintance] was transported to the New Hanover Police Department. She was seated in a chair immediately outside the small holding room where [Appellant] was being held. [Appellant] attempted to talk to [the female acquaintance] through the closed door. She leaned in to hear [Appellant] tell her to state to the police that [the victim] drugged her, raped her, and beat[] her, and that was the reason for [Appellant's] actions.

Afterwards, Officer David Fugelo, a member of the New Hanover Police Department [("Officer Fugelo"),] interviewed [the female acquaintance]. Fearful of [Appellant, the female acquaintance] complied with [Appellant's] orders. Consequently, during this interview, for the first time, [the female acquaintance] stated to the authorities that [the victim] and she were using drugs together when he began to make unwanted sexual advances toward her. [The victim] then assaulted her and[,] ultimately[,] he raped her. After photographs of her injuries were taken, [the female acquaintance] was transported to her residence in Gilbertsville to retrieve her leggings and other clothing for a rape kit to be performed. After the articles of clothing were retrieved, [the female acquaintance] was transported to the Berks County Prison on her open charges.

On April 5, 2016, Detective [] Bruchak [] attempted to speak with [the female acquaintance] at the Berks County Prison. At that time, [the female acquaintance] maintained that [the victim] had drugged, beaten, and raped her. She refused to talk with Detective Bruchak any further, and asked to be taken back to her cell. Later, on April 14, 2016, [the female acquaintance] was transported to the Lehigh County Jail. Detective Bruchak and Detective Richard Heffelfinger of the Lehigh County District Attorney's Homicide Task Force [("Detective Heffelfinger")] interviewed her. During this interview, they confronted her with evidence, including the [social media] messages between her and [the victim] that undermined her version of events. Consequently, [the female acquaintance] then admitted that [the victim] had not assaulted or raped her. She then recounted a version of events that was consistent with the incidents recounted by [the roommate and his girlfriend. The female acquaintance] even assisted the [police] officers in locating the baseball bat, by driving [] with them to [the friend's] residence, whose precise address she was not familiar. [The female acquaintance] was able to identify [the friend's] house as being located [in] Fleetwood, Pennsylvania.

On April 5, 2016, [Appellant's] truck was located in Pottstown[, Pennsylvania.] Thus, a search warrant was obtained for [Appellant's] truck. Corporal Troutman of the Pennsylvania State Police assisted with this search. The title to the [] truck was located within the vehicle, and established that the vehicle belonged to [Appellant]. Corporal Troutman processed and photographed the vehicle for evidence. Ultimately, it was determined that [Appellant's] blood was located on the interior door handle and exterior door handle of the driver's side door. In addition, Corporal Troutman searched and processed [the victim's vehicle]. Nothing of any evidentiary value was seized or recovered [from the victim's vehicle].

[The victim] died on April 4, 2016, at 4:45 [p.m., while still hospitalized,] as a result of the injuries to the head that he suffered. An autopsy was performed on April 6, 2016, by Dr. Barbara Bollinger [("Dr. Bollinger")], an expert in the field of forensic, clinical, and anatomical pathology. As a result of the autopsy, Dr. Bollinger identified, *inter alia*, multiple blunt force injuries to [the victim's] head, abrasions on his clavicle, bruises on his right hand, and scratches on his right forearm and right leg. Dr. Bollinger opined that the blunt force injuries to the head were the most severe injuries that [the victim] sustained. Dr. Bollinger

testified that she could identify at least two [] impact sites that were consistent with being struck[ or ]impacted in the head with a baseball bat with a significant amount of force. [The victim] had fractures to the skull, including to the base and the right parietal region. The fractures represent[ed] trauma to the skull. Additionally, as a result of these strikes, [the victim] suffered substantial internal injuries. There were signs of bleeding and soft tissue hemorrhaging on the top of and within the brain, as well as significant swelling of the brain itself to the point where the brain was pushing outside of the cranial cavity. Dr. Bollinger opined that without medical treatment, [the victim] would have suffered a quick neurological death due to the crushed brain stem. The cause of death was determined to be blunt force injuries to the head. The manner of death was deemed to be homicide.

While [Appellant] was incarcerated in Lehigh County Prison awaiting resolution of the [homicide] matter, [Appellant] made a plethora of telephone calls. In order to place a telephone call, a [personal identification number ("pin")] specific to the prisoner must be utilized. [Appellant] used his pin[,] as well as the pin[s] of two [] other prisoners who were housed in either the same cell or in close proximity with him in an effort to circumvent [identification or detection]. As is policy, these prisoner [tele]phone calls were [] recorded. In these telephone calls placed between April 4, 2016[,] and May 14, 2016, [Appellant] initially stated that he assaulted [the victim] because [the victim] raped [the female acquaintance]. Also, on April 5, 2016, [Appellant] indicated that he did not regret his actions. Throughout his telephone calls, [Appellant] discussed possible defenses in this matter, as well as the importance of keeping [the female acquaintance] happy and on his side. [Appellant] also repeatedly inquired if [the friend] "got rid of the stuff." On April 25, 2016, [Appellant] admitted that he struck [the victim] two times with the baseball bat. On May 14, 2016, [Appellant] recounted a version of events on the morning of April 3, 2016, [as follows,] and it did not include [the female acquaintance] being raped by [the victim]:

> I came home and [the female acquaintance] was fuckin, high. And that's when I took her [cellular tele]phone and said, ["]who the fuck gave you heroin?["] That's what I initially started with. I grabbed her and I fuckin drug her out of my house and threw her out and slammed the door shut and was like, get the fuck outta here, junkie. I have no fuckin time for you[,] and I threw her fuckin [tele]phone

at her and fuckin, I just went back into my room.  Do not, I'm not letting you back in my fuckin house and she's like, "just talk to me and just talk to me."  So, I fuckin, I, like, I sat her down and she's like, "I'm pregnant" and then, that's where I snapped.  That's when I said, "you're pregnant with my fucking kid and you're shooting [f]ucking dope?  Like, how did you even get the fuckin dope?"  I smack her, "what are you fucking the dude?"  And [the female acquaintance] said, "yeah, I'm fuckin him."  And I said, "yeah, I got somein for your fuckin ass" and put her down on the fuckin tarp, put a gun to her fuckin head and I couldn't shoot her.  I shoulda fuckin shot her.  And then fuckin, immediately snapped, dude.  Couldn't get outta that line of thinkin.

[At trial, t]he jury listened to approximately forty-two [] Lehigh County Prison telephone call[ recordings] in which [Appellant] participated.

PCRA Court Opinion, 12/14/22, at 2-7 (original brackets, extraneous capitalization, record citations, and ellipsis omitted).

On March 8, 2018, a jury convicted Appellant of first-degree murder, burglary – overnight accommodation with person present, kidnapping - to facilitate a felony, and kidnapping - to inflict bodily injury or to terrorize the victim.[1]  On March 9, 2018, during the penalty phase of the trial, a jury sentenced Appellant to life imprisonment for his first-degree murder conviction.  On April 16, 2018, the trial court sentenced Appellant to 10 to 20 years' incarceration for his burglary – overnight accommodation with person present conviction, with the sentence set to run consecutively to the life imprisonment sentence.  The trial court sentenced Appellant to 10 to 20 years'

---

[1]  18 Pa.C.S.A. §§ 2502(a), 3502(a)(1), 2901(a)(2), and 2901(a)(3), respectively.

incarceration for his kidnapping – to facilitate a felony conviction, with the sentence set to run consecutively to the sentence imposed for his burglary conviction. Finally, for his conviction of kidnapping - to inflict bodily injury or to terrorize the victim, the trial court sentenced Appellant to 10 to 20 year's incarceration, with the sentence set to run concurrently to the sentence imposed for his conviction of kidnapping – to facilitate a felony. Appellant's aggregate sentence was life imprisonment to be followed by 20 to 40 years' incarceration.

This Court affirmed Appellant's judgment of sentence on June 19, 2019. *Commonwealth v. Yaw*, 2019 WL 2524586, at *1 (Pa. Super. filed June 19, 2019) (unpublished memorandum). Appellant did not seek discretionary review by our Supreme Court and, as such, his judgment of sentence became final on July 19, 2019. *See* 42 Pa.C.S.A. § 9545(b)(3) (stating, "[a] judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of the time for seeking the review"); *see also* Pa.R.A.P. 1113(a) (requiring a petition for allowance of appeal to be filed within 30 days after entry of an order of this Court sought to be reviewed).

On June 11, 2020, Appellant filed *pro se* a PCRA petition, his first. Counsel was appointed to represent Appellant.[2] Counsel filed an amended

---

[2] The PCRA court initially appointed the Lehigh County Public Defender's Office to represent Appellant on his PCRA matter. PCRA Court Order, 6/25/20. Due

PCRA petition on December 23, 2020. The PCRA court conducted an evidentiary hearing on Appellant's amended PCRA petition on September 2, 2021, December 10, 2021, and May 2, 2022. Appellant submitted a brief in support of his petition on August 16, 2022, and the Commonwealth submitted a response brief on September 19, 2022. On September 20, 2022, the PCRA court denied Appellant's petition. This appeal followed.[3]

Appellant raises the following issue for our review:

Did the PCRA court err, abuse its discretion, [and] make erroneous and unsupported findings of fact[] and conclusions of law with respect to whether trial counsel ineffectively failed to investigate and present a diminished capacity defense at the guilt-phase [of the trial?[4]]

Appellant's Brief at 1.

Appellant's issue raises a claim that trial counsel provided ineffective assistance. *Id.* at 21-35. Specifically, Appellant alleges that trial counsel was ineffective for failing to investigate and present a diminished capacity defense during the guilt phase of Appellant's trial. *Id.* Appellant contends that trial

---

to a potential conflict of interest, however, the PCRA court, upon motion by the Public Defender's Office, appointed outside counsel to represent Appellant. PCRA Court Order, 7/6/20.

[3] Both Appellant and the PCRA court complied with Pennsylvania Rule of Appellate Procedure 1925.

[4] At trial, Appellant was represented by lead counsel, Matthew Potts, Esquire ("Attorney Potts") and co-counsel, Steven Mills, Esquire ("Attorney Mills"). Unless otherwise noted, we collectively refer to both gentleman as "trial counsel."

counsel failed to appreciate the need to raise a diminished capacity defense and failed to consult with the correct medical expert who could opine on Appellant's diminished capacity to commit first-degree murder. *Id.* at 30, 34. In developing this claim, Appellant explains that he suffers from brain damage brought on by a head injury, that he has endured a lifetime of depression, anxiety, and difficulties with impulse control, and that he has been subject to sexual and physical abuse and neglect at the hands of his father. *Id.* at 24-25. Appellant asserts that, due to these injuries and psychological impairments, he was unable to engage in higher thought processes, such as formulating the specific intent to kill another person. *Id.* at 21, 31. Appellant argues that trial counsel failed to ask Appellant's expert, Dr. Carol Armstrong,[5] "if [Appellant] met the criteria for a diminished capacity defense." *Id.* at 27. Appellant asserts that if trial counsel had asked such a question, trial counsel "would have learned from Dr. Armstrong that she does not opine on such matters and [trial counsel] could then have consulted with a different expert[.]" *Id.* Appellant argues that trial counsel's "[c]onsulting with Dr. [Frank] Dattilio[6] alone on [the] topic [of diminished capacity] was insufficient because [Dr. Dattilio] could not have conduct[ed] the neuropsychological

---

[5] Dr. Armstrong was admitted as an expert in the field of neuropsychology during the penalty phase of the trial. N.T., 3/9/18, at 45.

[6] Dr. Dattilio testified on behalf of Appellant at the PCRA evidentiary hearing on May 2, 2022. N.T., 5/2/22, at 212-295. As discussed more fully *infra*, Dr. Dattilio evaluated Appellant before trial at the request of trial counsel to determine Appellant's mental health status.

testing [necessary to formulate such an opinion] and [trial] counsel failed to consult with [Dr. Dattilio] again when Dr. Armstrong's [neuropsychological] testing [results were] available." ***Id.*** at 30-31. Appellant avers that Dr. Dattilio's opinion – that "Appellant's behavior had its genesis in an [anti-social personality disorder] rather than [Appellant's] myriad [of] mental impairments – was incorrect because it was rendered "without the benefit of the neuropsychological testing conducted by Dr. Armstrong." ***Id.*** at 25. Appellant argues that if trial counsel had consulted with another expert, such as Dr. Jethro Toomer,[7] the expert Appellant consulted with for purposes of his PCRA petition, trial counsel would have been able to offer a mental health opinion related to Appellant's diminished capacity to formulate specific intent to kill, and this "could only have supported and furthered [trial] counsel's largely unsupported specific intent argument." ***Id.*** at 34.

In addressing Appellant's issue, we are mindful of our well-settled standard and scope of review of an order denying a PCRA petition. Proper appellate review of a PCRA court's dismissal of a petition is limited to an examination of "whether the PCRA court's determination is supported by the record and free of legal error." ***Commonwealth v. Miller***, 102 A.3d 988, 992 (Pa. Super. 2014) (citation omitted). "The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record."

---

[7] At the PCRA evidentiary hearing, Dr. Toomer was admitted as an expert in the field of forensic psychology and testified on Appellant's behalf. N.T., 5/2/22, at 7-128; ***see also*** N.T., 9/2/22, at 5-152.

- 12 -

*Commonwealth v. Lawson*, 90 A.3d 1, 4 (Pa. Super. 2014) (citations omitted). "This Court grants great deference to the findings of the PCRA court, and we will not disturb those findings merely because the record could support a contrary holding." *Commonwealth v. Hickman*, 799 A.2d 136, 140 (Pa. Super. 2002) (citation omitted). In contrast, we review the PCRA court's legal conclusions *de novo*. *Commonwealth v. Henkel*, 90 A.3d 16, 20 (Pa. Super. 2014) (*en banc*), *appeal denied*, 101 A.3d 785 (Pa. 2014).

"It is well-established that counsel is presumed effective[.]" *Commonwealth v. Koehler*, 36 A.3d 121, 132 (Pa. 2012), *citing Strickland v. Washington*, 466 U.S. 668, 687-691 (1984). To plead and prove a claim of ineffective assistance of counsel, "a petitioner must establish: (1) that the underlying issue has arguable merit; (2) counsel's actions lacked an objective[ly] reasonable basis; and (3) actual prejudice resulted from counsel's act or failure to act." *Commonwealth v. Stewart*, 84 A.3d 701, 706 (Pa. Super. 2013) (*en banc*), *appeal denied*, 93 A.3d 463 (Pa. 2014). "A claim of ineffectiveness will be denied if the petitioner's evidence fails to meet any of these prongs." *Commonwealth v. Martin*, 5 A.3d 177, 183 (Pa. 2010). "In determining whether counsel's action was reasonable, we do not question whether there were other more logical courses of action which counsel could have pursued[. R]ather, we must examine whether counsel's decision[] had any reasonable basis." *Commonwealth v. Washington*, 927 A.2d 586, 594 (Pa. 2007). A petitioner establishes prejudice when he or she demonstrates "that there is a reasonable probability that, but for counsel's

[acts or omissions], the result of the proceeding would have been different."
***Commonwealth v. Johnson***, 966 A.2d 523, 533 (Pa. 2009).

It is well-established that a defense of diminished capacity "is an extremely limited defense available only to those defendants who admit criminal liability but contest the degree of culpability based upon an inability to formulate the specific intent to kill." ***Commonwealth v. Hutchinson***, 25 A.3d 277, 312 (Pa. 2011) (stating that, "[a]bsent an admission from the defendant that he [, or she,] killed the victim, trial counsel [cannot present] a diminished capacity defense" (original brackets omitted)), *cert. denied*, 566 U.S. 1035 (2012). "A diminished capacity defense does not exculpate the defendant from criminal liability entirely, but instead negates the element of specific intent" thereby mitigating first-degree murder to third-degree murder. ***Hutchinson***, 25 A.3d at 315 (citations and original quotation marks omitted). "To establish a diminished capacity defense, a defendant must prove that his[, or her,] cognitive abilities of deliberation and premeditation were so compromised, by mental defect or voluntary intoxication, that he[, or she,] was unable to formulate the specific intent to kill." ***Id.*** "If a defendant does not admit that he[, or she,] killed the victim, but rather advances an innocence defense, then evidence on diminished capacity is inadmissible." ***Id.*** Furthermore, "[e]vidence that the defendant lacked the ability to control his or her actions or acted impulsively is irrelevant to specific intent to kill, and thus is not admissible to support a diminished capacity defense." ***Id.*** "[D]iagnosis with a personality disorder does not suffice to establish

- 14 -

diminished capacity." *Id.* "[T]he authority to concede criminal liability and to authorize the presentation of a diminished capacity defense rests solely with the accused." *Id.* at 313 (emphasis omitted), *citing*, **Commonwealth v. Weaver**, 457 A.2d 505, 506-507 (Pa. 1983).

In dismissing Appellant's claim that trial counsel was ineffective for failing to pursue a diminished capacity defense, the PCRA court stated,

> Based on a careful review of the evidence in this case, the [PCRA] court found Appellant [] failed to demonstrate any of the required elements of ineffective assistance of counsel. Appellant's underlying claim is not of arguable merit. He claims [trial] counsel should have advanced a diminished capacity defense. However, the record reflects that neither Dr. Dattilio nor Dr. Armstrong raised diminished capacity as a potential issue. As Dr. Toomer confirmed, if either Dr. Dattilio or Dr. Armstrong had noted [diminished capacity], even if they were retained for the penalty phase alone, they were ethically obligated to advise counsel that it was a perceived issue.
>
> [Trial] counsel's election not to pursue a diminished capacity defense was reasonably designed to advance Appellant's interests. [Trial] counsel did not have evidence to support a diminished capacity defense. [Trial counsel] had evidence which [trial counsel] reasonably believed might support an assertion that Appellant committed voluntary manslaughter rather than first[-]degree murder. However, based on the evidence [presented] at trial, Appellant's apparent belief that [the victim] raped [the female acquaintance] was inaccurate. There was no[] adequate provocation by [the victim] towards Appellant [to support a conviction of voluntary manslaughter. Trial] counsel nonetheless attempted to argue for third[-]degree murder, which was the next best alternative. [Trial counsel] did not have evidence which would have supported a third[-]degree murder verdict based on reduction of the seriousness of the homicide charge stemming from a successful diminished capacity defense.
>
> Most significantly, there is no[] evidence of prejudice in this case. A diminished capacity defense had to be presented to counterbalance evidence of Appellant's intent. There was ample

- 15 -

evidence of Appellant's intent presented to the jury by the Commonwealth. The prosecution did not dispute that Appellant expressed repeatedly that he did not go to [the victim's residence] specifically intending to kill [the victim]. The evidence though clearly reflected that Appellant intentionally went to [the victim's residence] armed with both a gun and a metal baseball bat. After kicking in the door, Appellant was under control of his faculties sufficiently enough that he bypassed the others inside the [residence] when he went to the wrong bedroom at first. He fired the gun in the [residence], and he admitted during the prison [tele]phone recordings that he intentionally struck [the victim] repeatedly in the head with a baseball bat. He then took steps to hide the [baseball bat].

The jury heard Appellant's statements in the prison recordings that he did not intend to kill [the victim], but it was within the province of the jury to reject that assertion. Appellant repeatedly struck a vital part of [the victim's] body - his head - with a baseball bat. A jury may properly infer intent to kill, notwithstanding what Appellant expressed during the prison [tele]phone recordings and through his counsel at both his opening and closing [statements made] during the guilt phase.

In sum, Appellant's trial counsel was not ineffective. There is no[] evidence from which the [PCRA] court could determine that [trial counsel] erred by failing to present diminished capacity as a defense. The evidence suggests that Appellant was fully capable of forming intent to kill. The expert analyses [trial] counsel had prior to the trial did not support pursuing diminished capacity as a defense at the guilt phase of trial. While the jury was apprised of Appellant's expressed intent only to hurt [the victim] as he stated in the prison recordings, the jury was free to [] weigh those statements against [] the other evidence. [Trial] counsel was not ineffective in this matter.

PCRA Court Opinion, 12/14/22, at 19-21 (extraneous capitalization omitted).

The record reveals that, at trial, Appellant was represented by lead counsel, Attorney Potts and co-counsel, Attorney Mills. At the PCRA evidentiary hearing, Attorney Potts testified that, pursuant to his standard practice when representing defendants in capital cases, he asked the trial

court to appoint co-counsel and to provide funding authorization to retain a mitigation specialist and to obtain a mental health evaluation of Appellant. N.T., 12/10/21, at 30. In the case *sub judice*, upon obtaining the necessary court approval, trial counsel retained the services of Dr. Dattilio, a clinical and forensic psychologist. *Id.* at 10. Attorney Potts stated that, in seeking a mental health evaluation of Appellant, he requested a "relatively unspecific evaluation" of Appellant from Dr. Dattilio, meaning Attorney Potts did not pose a specific referral question to Dr. Dattilio pertaining to a particular diagnosis or legal defense, *i.e.*, diminished capacity. *Id.* Attorney Potts stated he was "essentially seeking to get the doctor's opinion on what he [thought] and what his ideas [were] regarding [Appellant's] mental health." *Id.* Attorney Potts testified that it was his practice to rely on the mental health expert to tell him if a defendant, such as Appellant, suffered from a mental health issue that would be "helpful" in formulating a defense strategy. *Id.* at 32, 53. Attorney Potts also stated that, based upon his own observations and interactions with Appellant, if he observed what he believed amounted to a potential mental health issue, he would have specifically brought that to the attention of Dr. Dattilio prior to the evaluation. *Id.* at 34.

In the case *sub judice*, Attorney Potts explained that, prior to Dr. Dattilio's evaluation of Appellant, he did not observe any characteristics in Appellant that suggested a competency issue, a diminished capacity defense, or that Appellant was unable to form specific intent to kill. *Id.* at 34, 42. Rather, based upon the 30-plus meetings he had with Appellant, Attorney

- 17 -

Potts thought Appellant was intelligent, a planner, and calculating because Appellant was very aware of the issues in his case and would often come to their attorney-client meetings with caselaw on specific issues. *Id.* at 22, 24 (stating, "I think [Appellant] thinks things through. I think he thinks things out."). Attorney Mills expressed similar thoughts concerning Appellant, stating that, based upon numerous meetings with Appellant, he thought Appellant was intelligent, thought highly of himself, and thought he was an "important deal" to people around him. *Id.* at 78, 81.

Dr. Dattilio testified that he was retained by trial counsel to conduct a mental health evaluation of Appellant. N.T., 5/2/22, at 227. Dr. Dattilio stated that, as part of this evaluation, he, *inter alia*, met with Appellant on three occasions, detailing a history of his life; administered a battery of psycho-diagnostic assessments and appraisals; reviewed materials relating to Appellant's criminal case, such as the criminal complaint and the affidavit of probable cause; conducted collateral interviews of Appellant's family members and neighbor; and listened to the recordings of Appellant's prison telephone calls. *Id.* at 227-230; *see also* Commonwealth PCRA Evidentiary Hearing Exhibit 6 at 1-4. As part of his evaluation, Dr. Dattilio understood that, *inter alia*, Appellant had been sexually and physically abused as a child, suffered several head injuries, was hospitalized for psychiatric concerns, and has a history of drug use. N.T., 5/2/22, at 232. Dr. Dattilio did not find, however, that Appellant's history had any effect on his cognitive ability to plan. *Id.* at 233. Instead, Dr. Dattilio opinioned that Appellant met the criteria for a

"full-blown anti-social personally disorder" diagnosis with sadistic and negativistic traits. *Id.* at 252; *see also* Commonwealth PCRA Evidentiary Hearing Exhibit 6 at 35. Dr. Dattilio stated that he felt Appellant's issues were more psychological issues rather than cognitive impairment issues. N.T., 5/2/22, at 254. Dr. Dattilio testified that he considered Appellant's potential for diminished capacity and whether Appellant possessed the ability to form a specific intent to kill as part of his evaluation, but he did not find evidence of a diminished capacity with Appellant. *Id.* at 285. Dr. Dattilio explained that he did not find diminished capacity because Appellant was able to provide Dr. Dattilio with details of the events leading up to the incident, including how Appellant left his house with the specific intent to confront the victim, how Appellant was able to go into the victim's house and navigate through its rooms, and how, upon finding the victim, Appellant struck the victim with a bat four times before leaving the victim's residence. *Id.* at 292. Dr. Dattilio stated he did not "see anything that was interfering with [Appellant's] flow of thought" as he was explaining the events. *Id.*

Attorney Mills described Dr. Dattilio's mental health evaluation results as "horrible" and "not helpful at all" to Appellant's defense because of the "sociopathic features" that were present in Appellant's background. N.T., 12/10/21, at 71, 74. Attorney Mills shared Dr. Dattilio's report and evaluation findings with Attorney Potts. *Id.* at 10. Attorney Potts stated that he understood that Dr. Dattilio's evaluation of Appellant was not going to be helpful in formulating a defense. *Id.* at 11. Because Attorney Potts and

Attorney Mills understood Appellant suffered prior head injuries and brain trauma, they retained the services of Dr. Armstrong, a neuropsychologist, for the purpose of having Appellant evaluated to determine if potential mitigation factors existed that could be presented during the penalty phase of the case. *Id.* at 12, 14-15.  When Attorney Potts spoke with Dr. Armstrong, his belief was that Appellant's case was no longer about presenting a diminished capacity defense or other mental health issues during the guilt phase but, rather, was about presenting mitigation factors "in an attempt to save [Appellant's] life in the penalty phase." *Id.* at 15.

Attorney Potts explained that, initially, the defense strategy was to present a voluntary manslaughter defense relating to provocation (verses self-defense) based upon the facts that Appellant became enraged after learning that the female acquaintance (his girlfriend) indicated that she was pregnant with his child, and that the victim raped the female acquaintance.[8]

---

[8] In general, "[a] person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he[, or she,] is acting under a sudden and intense passion resulting from serious provocation by[] the individual killed[, or] another whom the actor endeavors to kill, but he[, or she,] negligently or accidentally causes the death of the individual killed."  18 Pa.C.S.A. § 2503(a)(1) and (2) (formatting modified).

During his opening statement, Attorney Potts stated, *inter alia*,

> What happened that morning was certainly unfortunate.  This is not a case of a man who was intending to kill anybody.  This is a guy whose girlfriend revealed to him [that] she had been unfaithful, perhaps raped, certainly under the influence of drugs, and he just loses it.

*Id.* at 17. Upon learning this information pertaining to the alleged pregnancy and rape, Attorney Potts argued that Appellant did not form a specific intent to kill the victim but, rather, was acting under the "heat of passion."[9] *Id.* Attorney Potts further explained that, after the defense rested, the trial court denied a jury charge on voluntary manslaughter – provocation, which left trial counsel to argue a lack of specific intent during the closing.[10] *Id.* at 17-18.

_____

N.T., 3/5/18, at 41.

[9] Our Supreme Court has defined the "heat of passion defense" as follows:

> A heat of passion defense, like the diminished capacity defense, is a partial defense, focused on the element of intent. A defendant accused of murder may establish that he or she is guilty, not of murder, but rather of voluntary manslaughter, by proving that, at the time of the killing, he or she was acting under a sudden and intense passion resulting from serious provocation by the victim. Emotions encompassed by the term "passion" include anger, rage, sudden resentment[,] or terror which renders the mind incapable of reason. Whether the provocation by the victim was sufficient to support a heat of passion defense is determined by an objective test: whether a reasonable [person] who was confronted with the provoking events would become impassioned to the extent that his[, or her,] mind was incapable of cool reflection.

*Hutchinson*, 25 A.3d at 314-315 (citations and some quotation marks omitted).

[10] During his closing argument, Attorney Potts asserted, *inter alia*,

> I think we do have a number of facts that make it pretty clear that [Appellant's] intention was not to kill. His intention certainly was to beat [the victim.] It was certainly to harm [the victim].
>
> . . .

- 21 -

Attorney Potts explained that he thought the jury, at this point, might return a verdict of third-degree murder because Appellant had both a gun and a baseball bat when he entered the victim's residence and that Appellant only hit the victim with the baseball bat when he could have used the gun to shoot and kill the victim. *Id.* at 19. Attorney Potts believed that Appellant's decision not to use the gun demonstrated that he did not have a specific intent to kill

_____

> Had [Appellant] intended to kill [the victim] there was nothing stopping him from continuing to beat him, or simply taking the gun that everyone said was in his right hand and just shooting [the victim]. But [Appellant] didn't do that. He left.
>
> . . .
>
> [W]hat we're talking about is the intent to kill. As I indicated before, I don't believe that the Commonwealth can sustain its burden for first-degree murder. I think [Appellant's] actions show he was not intending to kill [the victim].
>
> . . .
>
> So when [Appellant] goes [to the victim's residence] and, again, whether or not we believe the rape happened, [Appellant] goes there believing, certainly, that his girlfriend [(the female acquaintance)] is having an affair, certainly that she's been injected with drugs, but probably that she was raped. So that is his intention. His intention is just an angry guy. What that is? Third-degree murder. That's what's left. It's a third-degree murder case, ladies and gentlemen. It's certainly not a first[-degree murder].

N.T., 3/7/18, at 15, 16-17, 27, 29-30.

- 22 -

the victim but only to maim the victim.[11] *Id.* Attorney Potts testified that he never believed diminished capacity was a viable defense because of the Commonwealth's evidence pertaining to Appellant's prison telephone calls. Attorney Potts explained that after reviewing the telephone call recordings that the Commonwealth presented to the jury, he believed that Appellant, during the course of the telephone calls, revealed that he carefully planned the sequence of events leading to the victim's death. Specifically, in the telephone calls, Appellant talked about how he placed the female acquaintance on a tarp and put a gun to her head but could not kill her; that he made the female acquaintance provide him a layout of the victim's residence and drive

_____

[11] Attorney Potts' defense strategy was further supported by a prison recording in which Appellant stated,

> I caved in his whole fuckin skull. I wanted him alive but not, I, you know, mentally retarded for the rest of his life.

Commonwealth PCRA Evidentiary Hearing Exhibit C-1, at 4/4/16 @ 1934 Recording.

> [M]y intention wasn't to kill him. My intention was to harm him. Seriously. . . . I didn't wanna kill him, obviously but because he didn't die then, you, you only get, you only get fuckin homicide if like, you go there and kill him. . . . I didn't go there with the intent to kill him. I went there with the intent to harm him and you can see it in my intentions because why would you bring a baseball bat, you see what I'm sayin, and a handgun? . . . Like, if I was tryin to kill him, I would've whacked him. That woulda been it. I woulda shot him in the fuckin face and that woulda been over with.

Commonwealth PCRA Hearing Exhibit C-1, at 4/5/16 @ 2146 Recording.

with him to the victim's residence; that he took a gun and a baseball bat with him to the victim's residence; that he initially kicked in the wrong bedroom door and upon realizing that the victim was not present, left the occupants unharmed; and that Appellant moved to the bedroom where the victim was located and the incident ensued. *Id.* at 44-45. Attorney Potts stated that the telephone calls demonstrated "a lot of planning, in [his] opinion, for a jury to believe that somehow [Appellant] was impaired, to the point where he couldn't form specific intent in this case." *Id.* at 45. Although Attorney Potts believed, based upon the experts' evaluations, that Appellant's mental disorder affected his cognitive functioning, he believed the diminished capacity defense would fail because Appellant's cognitive impairments did not affect his ability to deliberate and premeditate. *Id.* at 58. Attorney Potts explained that presenting a mental health defense, such as diminished capacity, meant "hav[ing] to make [the defendant] available to the Commonwealth to be evaluated[, and that] always is something that [he does not] like to do[.]" *Id.* at 60.

Attorney Mills reiterated that the defense strategy was to pursue a voluntary manslaughter – provocation defense and then, ultimately, to pursue a third-degree murder verdict based upon a heat of passion defense. *Id.* at 82. Attorney Mills agreed that presenting a diminished capacity defense was "destroyed" by the evidence of Appellant's prison telephone calls. *Id.* at 85, 100.

At the PCRA evidentiary hearing, Appellant presented the testimony of Dr. Toomer, who was admitted as an expert in the field of forensic psychology. N.T., 9/2/21, at 41-42. Dr. Toomer stated that he reviewed the penalty phase transcript (Appellant's PCRA Evidentiary Hearing Exhibit D-3), Dr. Armstrong's pre-trial evaluation report (Appellant's PCRA Evidentiary Hearing Exhibit D-4), and the trial court's June 5, 2018 opinion pertaining to Appellant's direct appeal (Appellant's PCRA Evidentiary Hearing Exhibit D-5). *Id.* at 43. Dr. Toomer also conducted an in-person evaluation of Appellant on July 22, 2021, which was several years after Appellant's trial and ultimate conviction. Dr. Toomer opined that based upon a totality of circumstances, which included knowledge of Appellant's sexual abuse, controlled substance abuse, and traumatic brain injuries, Appellant could not form a specific intent to kill. *Id.* at 76, 100; *see also* N.T., 5/2/22, at 118. Dr. Toomer explained that Appellant's traumatic brain injury prevented Appellant from engaging in reasoning, a higher order thought process, or executive functioning, which equates to abstract reasoning. N.T., 9/2/22, at 66, 68-69. Dr. Toomer explained that when a person suffering from an impairment cannot engage in planning or higher order thought or reasoning, such as in the case of Appellant, then the person cannot engage "in the process of necessarily forming intent or planning to do something." *Id.* at 77-78. Instead, a person, such as Appellant, reacts in a basic, primitive, and aggressive manner because that is the only thing the person knows to do. *Id.* at 78. Dr. Toomer stated that he believed that it would never be possible for Appellant, due to, *inter*

*alia*, his traumatic brain injuries and history of substance abuse and toxic stress, to be able to maintain the capacity to form specific intent. ***Id.*** at 100.

Upon review, we discern no abuse of discretion or error of law in the PCRA court's denial of Appellant's petition. We concur with the PCRA court, and the record supports, that there was no evidence "from which [Appellant's] trial counsel could have pursued a diminished capacity defense" because despite Appellant being evaluated by two experts, "neither expert concluded he suffered from diminished capacity" at the time of the incident. PCRA Court Opinion, 9/20/22, at 16. Trial counsel relied upon the expert opinions of Dr. Dattilio and Dr. Armstong in formulating a defense strategy, and neither expert opinion presented a factual basis to support a diminished capacity defense. While Appellant presented the testimony and evaluation results of Dr. Toomer at the PCRA evidentiary hearing that indicated Appellant suffered from mental health deficiencies such that he was incapable of ever formulating an intent to kill, trial counsel was not obligated to disregard the conclusions reached by Dr. Dattilio and Dr. Armstrong and continue to seek a mental health expert, such as Dr. Toomer, who was willing to support a diminished capacity defense. ***Commonwealth v. Bracey***, 795 A.2d 935, 942-943 (Pa. 2001) (stating, "[trial] counsel was not required to disregard the findings of his expert and continue to consult experts, at the expense of limited judicial resources, until he found one willing to testify that [Bracey] was organically brain damaged or manifested some kind of major mental illness"); ***see also Commonwealth v. Sepulveda***, 55 A.3d 1108, 1122 (Pa. 2012) (stating that,

a court, in assessing trial counsel's performance in the context of a ineffectiveness claim, must be careful to assess that performance "without the distortion of hindsight, and must instead review the circumstances under which [trial] counsel's decisions were made").

Moreover, we concur with the PCRA court, and the record supports, that trial counsel, without evidence to support a diminished capacity defense, pursued a reasonable defense strategy of first seeking a voluntary manslaughter conviction based upon provocation and, ultimately, arguing in favor of a third-degree murder conviction in an effort to obtain a resolution of the matter for Appellant that did not involve a sentence of death or life in prison. PCRA Court Opinion, 9/20/22, at 18. As trial counsel indicated, asserting a diminished capacity defense was not a viable option given the lack of an expert opinion in support thereof and especially in light of the overwhelming evidence of planning and premeditation demonstrated by the Commonwealth's evidence of Appellant's prison telephone calls. Therefore, we concur with the PCRA court that Appellant failed to demonstrate that trial counsel's actions lacked an objectively reasonable basis. *See Martin*, 5 A.3d at 183 (holding that, an order denying a PCRA petition may be affirmed if the petitioner fails to meet any one of the three prongs necessary to support an ineffectiveness claim).

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date:  11/21/2023